UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TC TRANSCONTINENTAL PACKAGING INC., Plaintiff, -v- UTECO CONVERTING S.p.A. *and* UTECO NORTH AMERICA, INC., Defendants. | 25 Civ. 3449 (PAE) OPINION & ORDER |

PAUL A. ENGELMAYER, District Judge:

This contract dispute arises from the sale of an industrial-sized and customized digital printing machine. Plaintiff TC Transcontinental Packaging Inc. ("TC") sues Uteco Converting S.p.A ("Uteco Converting") and Uteco North America, Inc. ("Uteco NA") (collectively, "Uteco" or "defendants"), for, *inter alia*, breach of contract, fraudulent concealment, and unjust enrichment. These claims arise from Uteco's sale of a giant printer, for use in packaging dairy products, that TC alleges failed to perform as intended. TC seeks compensatory damages, incidental damages for its costs and expenses, and punitive damages for Uteco's alleged misrepresentations.

Uteco Converting moves to dismiss all of TC's claims, except for a claim based on the implied warranty of merchantability, asserting a failure to state a claim, under Federal Rule of Civil Procedure 12(b)(6). Dkt. 25. Uteco NA moves to dismiss all claims against it. *Id.* at 31. For the reasons that follow, the Court grants in part and denies in part the motion to dismiss.

# I. Background[1]

## A. Factual Background

### 1. The Parties

TC manufactures and supplies printed flexible packaging products. Dkt. 21 ("AC") ¶ 20. A foreign corporation, it operates a facility in Clinton, Missouri. *Id.* ¶ 1.

Uteco is a global manufacturer of flexible packaging machinery, including printing presses, laminators, and digital printing machines. *Id.* ¶¶ 2, 21. Uteco Converting is an Italian corporation with a principal place of business in Italy. *Id.* Uteco NA, a subsidiary of Uetco Converting, is a Georgia corporation with a principal place of business in Kennesaw, Georgia. *Id.* ¶¶ 3, 5.

### 2. The Machine

In June 2018, Uteco launched the Sapphire EVO, a high-speed digital inkjet printing press for flexible packaging. *Id.* ¶ 22. Uteco developed the Sapphire EVO with Kodak, which developed a "proprietary continuous inkjet technology" enabling users to print up to 150 meters per minute. *Id.* (cleaned up). In 2018, Naples, Italy–based Nuova Erreplast, S.r.l. ("Nuova Erreplast") became the first company to purchase a Sapphire EVO packaging machine from Uteco. *Id.* ¶ 30.

In September 2019, TC approached Uteco NA to discuss purchasing a Uteco Sapphire EVO. *Id.* ¶ 21. Working with Uteco NA's executive vice president, Mario Mucciacciaro, TC

---

[1] The following facts are drawn primarily from the Amended Complaint ("AC"). *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). For purposes of resolving the motion to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the AC as true, drawing all reasonable inferences in TC's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

sought to identify a Uteco device suited for printing "flexible packaging products for the dairy industry." *Id.* TC alleges that because it intended to use the printer for food packaging, and must guard against ingestion by consumers of ink or other potentially toxic chemicals, its essential purpose necessarily involved ensuring the ink would remain permanently affixed to any surface. *Id.* ¶ 25. TC ultimately selected a Uteco Sapphire EVO 242 Model 60 digital and reverse printing machine (the "Machine"). *Id.* ¶¶ 21, 23. The Machine measures approximately 63 feet long, 24 feet wide, and 13.5 feet high. *Id.* ¶ 77.

In October 2019, Uteco told TC that the Machine required water-based inks, and that these inks complied with European and United States regulations governing indirect food contact. *Id.* ¶ 26. Uteco touted the sustainability benefits of this feature, which, it stated, would "simplify packaging structures by eliminating the need for expensive barrier layers and coatings." *Id.* Uteco also represented that the Machine would be capable of printing approximately 97% of the Pantone color palette. *Id.* As of October 2019, Uteco had never installed a Sapphire EVO for digital printing, in the United States or elsewhere. *Id.* ¶¶ 27–28.

Between November 2019 and March 2020, TC and Uteco negotiated features that TC required for the purchase of the Machine. *Id.* ¶ 29. During this period, Uteco installed two Sapphire EVO packaging machines for other customers: in late 2019, at Kinyosha Printing Co., Ltd ("Kinyosha") in Tokyo, Japan, and in 2020, at Nuova Erreplast's facility in Italy. *Id.* ¶¶ 31–32. As to the Kinyosha installation, TC alleges that the Sapphire EVO supplied to Kinyosha proved "incapable of printing on plastic substrates and therefore could not meet Kinyosha's needs." *Id.* ¶ 35. As to the Nuova Erreplast installation, TC alleges that a dispute arose about whether the machine was able to "meet its intended application requirements." *Id.* ¶ 36. TC

alleges that Uteco did not disclose to it, before or after delivery, these issues it had with other customers. *Id.* ¶ 37.

### 3. The Agreement

On or about March 30, 2020, TC and Uteco entered into an agreement, under which Uteco would produce the Machine consistent with certain specifications and TC would pay €3,500,000 upon acceptance. *Id.* ¶ 38; *see also* Dkt. 21-1 (the "Agreement"). The Agreement provided that any disputes would be governed by New York law and resolved in a New York court. *Id.* at 47.

The Agreement set out the capabilities, termed "[p]rinting possibilities," of the Machine. The specifications included the capacity to print the following:

> Surface (white registered + primer + CMYK + varnish + 0)
>
> Reverse (0 + primer + CMYK + white continuous/registered + registered varnish on opposite side)
>
> Reverse (registered PMS + primer + CMYK + white continuous/registered + 0)
>
> Reverse (registered PMS + primer + CMYK + registered PMS + white continuous/registered + 0)
>
> Surface (white registered + primer + CMYK + registered PMS + registered PMS)

*Id.* at 4.

The Agreement also specified the materials, printing width, machine speed, and inks of the Machine. AC ¶¶ 40–45. These specifications included:

- *Materials to be printed*: OPP (oriented polypropylene, a type of plastic film), PET (polyethylene terephthalate, a type of semi-rigid plastic), PE (polyethylene, a type of plastic film), OPA (oriented polyamide, a polymer film made from nylon resin), and "laminates." Agreement at 5.
- *Material and printing width*: Minimum material width of "325 mm" and a maximum material width of "650 mm." *Id.* at 4. Maximum printing width of "620 mm." *Id.*

- *Machine speed*: Minimum printing speed of 20 meters per minute, subject to the type of inking system, inks, solvents, and model. *Id.* The maximum printing speed "depends on all the following printing conditions," including, "ink coverage," "type of material," "inks, lacquers and solvents," and "required print quality." *Id.*

- *Types of ink*: Water based inks on the ink jet section, and on the upstream and on the downstream units. *Id.* at 5.

As to the ink, the Agreement required the Machine to use materials supplied by Kodak and approved by Uteco, specifically:

> Exclusively ink, fluids or supplies supplied by Kodak or manufactured to Kodak's specifications with Kodak's prior written approval on the KODAK System section (this section will NOT be explosion- proof).
>
> REMARK:
>
> In case of an inline OPV (over printing varnish) is not foreseen or not applied, the Customer must previously check the scratch resistance and the glossiness with the digital inks by a test at Kodak Plant.

*Id.*

The Agreement also included representations as to the scope and timing of the parties' guarantees. *Id.* at 47–50. It specified, for example, that these would be considered "expired" 12 months from the "machine start-up and commissioning at customer's plant (which is the printing of the material to be sold or used)." *Id.* at 50.

The Agreement provided for two test runs to be conducted: one at Uteco's premises (a "FAT") and one at TC's facility (a "SAT"). The FAT was to consist of:

> (1) verification of the contractual Equipment conformity;
>
> (2) static test of the mechanical and electrical operations;
>
> (3) threading of one material through the Equipment, chosen by the Buyer, among the ones indicated in the contract;
>
> (4) speed test;
>
> (5) reel change test;

> (6) printing test either with Uteco job or job suggested by the Customer and approved by Uteco.
>
> All materials, of first quality, are to be supplied by the customer and be at the Uteco's plant al [sic] least 40 days before test-run.
>
> Within that date the Uteco will send an information test-run questionnaire where all information regarding the receipt of the materials are indicated. All specifications regarding the test, the repeat to be used, inks, etc. must be communicated to the person in charge of test-runs at Uteco, for acceptance. Should Uteco supply all the materials to carry out the test-run, the customer will be invoiced with the relevant cost. The test-run will last one week maximum. At the end of the test, an "Acceptance Protocol" proving the Equipment contractual conformity will be issued.

*Id.* at 51.

> The SAT was to consist of:
>
> (1) Verification of the mechanical and electrical equipment capacity;
>
> (2) Quality production test, including: 1 (one) printing test, at Buyer's choice among the ones included in the Contract, lasting no more than 1 day either with Uteco job or job suggested by the Customer and approved by Uteco.
>
> All materials - of first quality - for the final test will be completely supplied by the buyer and must be available within the end of the installation.
>
> At the end of the test, an "Equipment Start-up" Protocol will be issued. (*)
>
> The *Guarantee period will start from that date and, in any case, will have a maximum validity calculated from the date of machine ready for shipment*, as indicated in the "Particular Guarantee" paragraph.

*Id.* (emphasis added).

### 4. The Performance Tests and Delivery

Between March 8 and on or about March 11, 2021, the first FAT was conducted at a Uteco Converting facility in Italy. AC ¶ 52. TC alleges "the FAT failed," because TC identified certain "registration issues" with the Machine's "control system." *Id.* ¶ 53. On or about March 25, 2021, a second FAT was conducted by videoconference. *Id.* ¶ 54. TC alleges the outcome of the second FAT was unsuccessful. *Id.* ¶ 55.

In the "spirit of cooperation and as a demonstration of good faith," however, TC stated that it would nonetheless "accept" the Machine. *Id.* TC conditioned its acceptance on Uteco's resolving certain "nonconforming problems" with the Machine, including those identified during the first and second FATs, to "TC's satisfaction" in the near future. *Id.* On April 5, 2021, TC memorialized these issues, noting that the Machine had been unable at the second FAT to:

- Maintain no more than 1/2 inch of space on each side of the web with no crossover into the design;
- Return to register within 600 feet after a stop without operator involvement;
- Maintain register of +/-.01 inch during a Flexo-to-digital run (with digital-to-digital acceptable);
- Repeat jobs by returning up and in register within 600 feet of startup once photo eyes were in place;
- Demonstrate one surface and one reverse registered white to registered spot in follow-up testing on OPP.

*Id.* ¶ 53.

On April 29, 2021, TC paid Uteco $3,742,059.35—90% of the price set out in the Agreement—for the Machine. *Id.* ¶ 57. On or around May 15, 2021, Uteco shipped the Machine from Verona, Italy to TC's facility in Clinton, Missouri (the "Capri Site"). *Id.* TC alleges that Uteco promised "to continue to resolve the problems TC ha[d] with the Machine." *Id.*

On or around August 18, 2021, TC commenced a SAT of the Machine at the Capri Site. *Id.* ¶ 58. After the SAT, TC continued to raise "issues" including, *inter alia*, "unacceptable testing results, lamination issues, wrinkling, and failures in OPV adhesion when using Kodak inks and OPV products required by Uteco." *Id.*

On or about September 8, 2021, a second SAT was conducted, at which the Machine again "failed." *Id.* ¶ 59. The Machine:

> fail[ed] to lay down white ink cleanly and producing stitching lines; digital print stitching defects, streakers, and broken C2C marks that persisted despite multiple service cleans; loss of registration during ramp-up and mid-run; excessive setup footage required (400–600+ feet) to achieve register; inconsistent adhesion of inks due to insufficient dye levels on film; wrinkles on PET films during longer runs; and repeated operational interruptions, including Kodak UPS power loss and the need for constant manual intervention.

*Id.*

TC also found the Machine's performance in a wet rub test deficient, because the test revealed the ink provided by Kodak could be easily removed by water. *Id.* The printer thus was "unusable for any application," and particularly for "use in the food industry." *Id.* Uteco agreed to resolve these problems and the others TC had previously identified. *Id.*

Thereafter, TC signed portions of a Uteco Start-Up Certificate, but, given the unresolved issues, refused to sign the entire agreement, including a portion in which it would have affirmed that the Machine had fulfilled all the SAT requirements. *Id.* ¶ 56. As a result, Uteco requested the Machine be placed in "safe mode," rendering it inoperable without Uteco personnel present. *Id.* TC then unilaterally installed the Machine at its Capri site, and used the Machine for a single customer trial. *Id.* ¶¶ 76, 88.

During 2021 and 2022, TC identified and notified Uteco of further "nonconformities" it identified in the Machine. *Id.* ¶¶ 62–63. These were consistent with issues TC had previously identified—with the printing width, use of water-based ink, stitch lines, and laminate wrinkling. *Id.* ¶ 62.

On or about May 4, 2023, TC and Uteco conducted a third SAT to measure the Machine's performance against a series of indicators (the "Test Protocol"). *Id.* ¶ 64. In August 2023, a fourth SAT was conducted. *Id.* ¶ 66. As part of it the parties conducted a wet rub test. *Id.* TC alleges that the "criteria of the Test Protocol were not met as the results were unsatisfactory due to ink smearing." *Id.* On November 13, 2023, TC sent a letter to Uteco,

outlining its issues with the Machine and proposing a "32-hour repeatability test" as a "solution" to the issues identified in the latest SAT. *Id.* ¶ 67. Uteco "refused to perform the repeatability test and refused to refund TC's payments." *Id.*

TC maintains that, as a result, the Machine is "noncompliant with the Agreement," "not technically viable," and "not economically feasible." *Id.* ¶¶ 68–69.

### B. Procedural History

On March 3, 2025, TC filed this lawsuit in New York State Supreme Court in Manhattan. Dkt. 1-1. On April 25, 2025, Uteco removed the action to this Court, based on diversity of citizenship. Dkt. 1. On July 31, 2025, Uteco moved to dismiss, Dkt. 18, and filed a memorandum of law in support, Dkt. 19. That same day, the Court ordered TC to either amend its complaint or oppose the motion to dismiss by August 21, 2025. Dkt. 20. On August 21, 2025, TC filed the AC. Dkt. 21. On September 25, 2025, Uteco moved to dismiss the AC, Dkt. 24, and filed a memorandum of law in support, Dkt. 25 ("Mem."), and declarations from its counsel, Stuart Kagen, Esq., Dkt. 26, and Uteco's Converting sales manager, Fabio Fiorucci, Dkt. 27. On October 27, 2025, TC opposed the motion, Dkt. 28 ("Opp'n"), and filed a declaration from TC's vice president for dairy protein, Jeff Lasley, Dkt. 29. On November 17, 2025, Uteco replied. Dkt. 35 ("Reply").

## II. Applicable Legal Standards

### A. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *see Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet is "inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

In considering a motion to dismiss, a district court must "accept[ ] all factual claims in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (cleaned up). However, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's *[f]actual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555) (emphasis in *Arista Records*). A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

**B. Rule 9(b)**

A claim sounding in fraud must also satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See Eternity Global Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004); *Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 327 (S.D.N.Y. 2006). Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To satisfy this Rule, a complaint alleging fraud must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *United States ex rel. Ladas v. Exelis, Inc.*,

824 F.3d 16, 25 (2d Cir. 2016) (internal quotations omitted). In addition, a claim must "allege facts that give rise to a strong inference of fraudulent intent." *U.S. Cap. Partners, LLC v. Stanwich Cap. Advisors, LLC*, No. 14 Civ. 4138, 2015 WL 4388421, at *3 (S.D.N.Y. 2015) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). "The requisite 'strong inference' of fraud may be established either [i] by alleging facts to show that defendants had both motive and opportunity to commit fraud, or [ii] by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).

## III. Discussion

### A. Breach of Contract (Count One)

To state a claim for breach of contract, a plaintiff must plausibly allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir. 1996)).

In moving to dismiss this claim, Uteco principally contends that the AC does not plausibly claim a breach of the Agreement. Mem. 4–9. That is wrong. The AC plausibly alleges several such breaches. *See, e.g.*, AC ¶ 82(a)–(e).

First, the AC plausibly alleges breach of multiple technical specifications required by the Agreement, including as to the Machine's printing width and run speed. The Agreement provided that the Machine would achieve a minimum material width of 325 mm and a maximum of 650 mm. Agreement at 5. The AC alleges, however, that the Machine, as built, was capable of printing less (by one inch) of the "full represented printing width." AC ¶ 41. The Agreement also provided that the Machine would have a maximum mechanical speed of 300 meters per

minute and a minimum printing speed of 20 meters per minute. Agreement at 4. The AC alleges, however, that the Machine, as built, achieved a maximum mechanical speed of 250 feet per minute—barely above 25% of the capacity specified in the Agreement. AC ¶¶ 42, 71. The AC plausibly pleads that these specifications were material, noting that the Agreement took the trouble to specify that "all the values regarding the tension (Lb), speed (f.p.m.), temperature (F), thickness (mil)" were to be "indicated" in the Anglosaxon system. Agreement at 7. The AC also pleads that the Machine, as built, also deviated from the Agreement's specifications as to water-based white ink, quiet zone requirements, and lamination features. *Id.* ¶ 82.

Uteco counters that the provisions in the Agreement with respect to such conditions merely represented merely what the Machine "could achieve," and were not guarantees. Mem. at 7–8. That claim cannot be credited on the pleadings. The AC's allegation is amply plausible in that these specifications were contractually required, with the purpose, understood by the parties, of enabling TC to deploy the Machine to meet its distinct business need in the dairy industry. *See PPC Broadband, Inc. v. Transformix Eng'g Inc.*, No.14 Civ. 315, 2015 WL 339564, at *9 (N.D.N.Y. Jan. 26, 2015) (denying motion to dismiss breach of contract claim where specialized machine did not meet "contractually required" performance level, in that it fell short of the specified "run rate per minute"). Where parties have entered into a contract concerning complex equipment, courts have widely recognized that deviations from a product's specifications can support a plausible claim of breach of contract. *See e.g.*, *Beautiful Home Textiles (USA), Inc. v. Burlington Coat Factory Warehouse Corp.*, No. 13 Civ. 1725, 2014 WL 4054240, at *8 (S.D.N.Y. Aug. 15, 2014) (failure to deliver particular goods that complied with "agreed-upon specifications" could support a breach of contract claim); *PNCEF, LLC v. OZ Gen.*

*Contracting Co.*, No. 11 Civ. 724, 2012 WL 4344538, at *4 (E.D.N.Y. Sept. 21, 2012) (breach of contract claim where equipment "did not function properly" after delivery to customer).

Second, the AC plausibly alleges a breach by Uteco in connection with the requirement that the parties promptly develop an "acceptance protocol" for the FAT and the SAT. The Agreement states that the parties shall, "[w]ithin 60 days from the signature of the Order []," agree on "an acceptance protocol for the FAT and SAT." Agreement at 54. The AC plausibly pleads that such an "acceptance protocol" was integral. Indeed, the Agreement provided that "[i]f [the Machine] does not fulfil the agreed acceptance protocol . . . the Buyer may cancel the Contract of Sale and its obligation to purchase this press." *Id.* at 52. In alleging breach, the AC states that, although the parties signed the Agreement on March 30, 2020, and although Uteco outlined steps from inception to acceptance of the project, it did not meaningfully pursue an acceptance protocol, with the result that "[n]o acceptance protocol was ever agreed upon." *See, e.g.*, AC ¶¶ 48–51, 57–58, 64. TC, it states, "sent its agreed acceptance protocols" to Uteco, but "Uteco never formally agreed upon the acceptance protocol." *Id.* ¶ 50. These allegations plausibly allege that Uteco failed to do its part towards identifying and implementing an acceptance protocol. *See, e.g.*, *Talkdesk, Inc. v. Unique Travel Corp.*, No. 23 Civ. 9543, 2024 WL 4904684, at *3 (S.D.N.Y. Nov. 27, 2024) (plausibly pled breach where defendant failed to perform its "obligations under the Agreement, including . . . technical obligations"); *Somnia, Inc. v. Change Healthcare Tech. Enabled Servs., LLC*, No. 19 Civ. 8983, 2021 WL 639529, at *5 (S.D.N.Y. Feb. 16, 2021) (complaint's identification of at least "seven contractual provisions" not met supported breach of contract claim to survive motion to dismiss).

Uteco's counterargument disputing breach of this provision—that agreement on an acceptance protocol was precatory—is questionable on the merits. The Agreement references an

"acceptance protocol" in six distinct provisions and provides that the failure to agree on such a protocol would permit recission of the contract. *See* Agreement at 51–52, 54. In all events, although the point will assuredly be a focus of discovery, the AC adequately pleads that the inability of the parties to agree on such a protocol is traceable to Uteco's alleged failure to work with TC to develop such, as required. *See, e.g.*, *Thompson v. Liquichimica of Am., Inc.*, 481 F. Supp. 361, 364 (S.D.N.Y. 1979) (recognizing plausible breach of contract claim where defendants failed to use their "best efforts" to reach agreement with plaintiff); *MPI Tech A/S v. Int'l Bus. Machines Corp.*, No. 15 Civ. 4891, 2017 WL 481444, at *5–6 (S.D.N.Y. Feb. 6, 2017) (same).

Third, the AC plausibly alleges that Uteco breached the Agreement by shipping the Machine to TC without its having yet satisfied the FAT and the SAT. Uteco opposes this, contending the Agreement did not require that the Machine, before being shipped, first meet the FAT and SAT. The pleadings, however, plausibly support this theory of breach. The Agreement identified the FAT and SAT as "sales conditions," compliance with which would establish the Machine was in "conformity" with the contract. Agreement at 51. TC provided Uteco with an "FAT Acceptance File," supporting that its conditional acceptance of the Machine was based on the Machine's satisfying the open issues identified at the FAT. *See* Dkt. 27-1. TC's cover email accompanying this file added that, "[a]s discussed in our closing meeting the items listed below are critical to the . . . approval of the machine." *Id.* at 2. Uteco notes that TC's original complaint alleged the FAT issues could be resolved "at a later phase." Mem. at 5 n.2. But TC's claim is not merely about the timing of the failure to remediate but the failure at all times to meet the terms of TC's conditional acceptance and the Agreement. *See* AC ¶¶ 82(b), (h). And the AC alleges that Uteco never resolved the registration issues identified in the FAT (including as set

out in the post-FAT email). TC's purported admission that the deficiencies could be later remedied—made in an earlier complaint that is no longer operative here, *see, e.g.*, *Days v. Cnty. of Westchester*, No. 18 Civ. 11538, 2025 WL 1898948, at *1 (S.D.N.Y. July 9, 2025)—thus does not vitiate the AC's claim of breach.

Fourth, TC plausibly alleges a breach of the Agreement regarding Uteco's application of excessive overprint varnish ("OPV"). The AC alleges Uteco "approved varnish for OPV that was unable to meet TC's requirements" that testing revealed the "application of excessive OPV as approved by Uteco," and that the thickness of the varnish caused "blocking" and "ink smearing." AC ¶ 82. The Agreement provided that Uteco was to "verif[y]" the OPV or any further coating on digital printing, and that the Machine was subject to a "printing test either with Uteco or job suggested by [TC] and approved by Uteco." Agreement at 6, 51. TC alleges that when it used the OPV recommended by Uteco, it found such "incompatible" with Kodak inks. AC ¶ 82. The test prints, it alleges, resulted in smeared images and the OPV caused the flexible packaging to become brittle. *Id.*

Uteco makes three counterarguments—that the AC does not plead that any OPV issues arose before the delivery of the Machine, that TC's original complaint admitted that any issues could be fixed "at a later phase," and that the Agreement did not expressly bar delivery of the machine while it had unresolved OPV-related issues. Mem. at 6. These do not support dismissal of this claim of breach. First, as to the timing of TC's notification of the OPV-related issues, the Agreement conditioned its unreserved acceptance on both the test run at Uteco's premises (FAT) and a test run at TC's plant (SAT). Agreement at 51. As such, that the OPV issues had gone unspotted at the FAT did not absolve Uteco of its contractual obligations with respect to this component. Second, as to TC's admission in an earlier complaint that post-FAT registration

issues could be fixed at a "later phase," even assuming that that admission bound TC here, *but see Days*, 2025 WL 1898948, at *1, the AC's central allegation is that the OPV-related issues were never resolved, not that they were untimely resolved. Third, the AC plausibly pleads that the Agreement contemplated that the Machine, as delivered, would meet OPV-related specifications, including by passing a "quality production test." *See* Agreement at 51.

The AC thus plausibly alleges multiple breaches of the Agreement by Uteco. The Court accordingly denies Uteco's motion to dismiss the contract breach count. *See, e.g.*, *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 727 (2d Cir. 1992); *E. Empire Constr. Inc. Borough Constr. Grp. LLC*, 156 N.Y.S.3d 148, 151–52 (1st Dep't 2021); *Populus Media, Inc. v. Erb*, No. 23 Civ. 2160, 2024 WL 1313493, at *4 (S.D.N.Y. Mar. 26, 2024).

### B. Implied Covenant of Good Faith and Fair Dealing (Count Two)

The AC alleges that Uteco breached an implied duty of good faith and fair dealing, by shipping the Machine in the face of its post-FAT deficiencies, and by failing to engage in on-going efforts to remedy these deficiencies. AC ¶ 94. Uteco moves to dismiss, arguing that the allegations underlying its implied covenant claim track those in its breach of contract claim. Uteco is correct that there is some such overlap. Mem. at 9–11. But the AC also appears to base this claim on allegations distinct from those underlying the contract-breach claim. To enable a clear delineation, and because there is no prejudice to sustaining this claim for the time being, the Court accordingly will deny the motion to dismiss the implied covenant claim, without prejudice to Uteco's right, at summary judgment, to move to prune this claim of overlapping allegations.

Under New York law, "a duty of good faith and fair dealing is implied in every contract," *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 37 (S.D.N.Y. 2017), *aff'd*, 712 F. App'x 85 (2d Cir. 2018) (summary order). It requires that neither party "do anything which will have the effect of destroying or injuring the right of the other party to

receive the fruits of the contract," *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (citation omitted). "Said simply, 'the covenant requires the parties to perform under the contract in a reasonable way.'" *111 W. 57th Inv. LLC v. 111 W57 Mezz Inv. LLC*, 2026 WL 1502410, at *3 (N.Y. May 28, 2026) (quoting *Cordero v. Transamerica Annuity Serv. Corp.*, 39 N.Y.3d 399, 410 (2023)). But "the implied covenant is not without limits," and "courts will imply a covenant 'only in aid and furtherance of other terms of the agreement of the parties.'" *Id.* (quoting *Singh v. City of New York*, 40 N.Y.3d 138, 146 (2023)).

Here, TC's implied covenant claim, like its contract-breach claim, arises from the Machine's alleged deficiencies in printing width and speed specifications, Uteco's failure to agree on an FAT and SAT protocol, and Uteco's use of OPVs incompatible with Kodak inks and materials. *Compare id.* ¶¶ 81–82, *with id.* ¶¶ 91–92. Both claims allege violations of the written Agreement" insofar as the Agreement provided "for the purchase, delivery, installation, and commissioning of the Machine." *Compare id.* ¶ 80 *with id.* ¶ 91.

The implied covenant claim, however, appears to go beyond the contract-breach claim, in alleging bad-faith conduct by Uteco after the Machine's delivery and during the parties' extended negotiations regarding its deficiencies. Specifically, as to this claim, the AC alleges that Uteco failed to take "reasonable and timely steps" to cure the alleged defects, refused to conduct a 32-hour repeatability test, and threatened to put the Machine in "safe mode" unless TC signed a Uteco Start-Up Certificate. *Id.* ¶¶ 94(a), (g)–(h).

These latter aspects of Uteco's conduct appear to exceed the conduct on which the breach of contract claim is based. If so, and if such conduct was outside the scope of conduct that could be the basis for a contract-breach claim, such would permit the implied covenant claims to stand. *See, e.g.*, *Taco, Inc. v. Am. Home Assurance Co.*, No. 24 Civ. 7041, 2025 WL 2419707, at *4–5

(S.D.N.Y. Aug. 21, 2025) (implied covenant claim not duplicative where "allegations suggest a potential intentional subversion of the contract from [defendant], as opposed to a failure to execute the terms of the contract itself"); *Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, No. 20 Civ. 5015, 2021 WL 3668092, at *5–6 (S.D.N.Y. Aug. 17, 2021) (same, where implied covenant claim was based on defendant's "bad faith decision," which may not have "breach[ed] the terms of the contract in a technical sense" (citation omitted)).

The Court's judgment is that it is prudent to permit the implied covenant claims to survive through discovery. With a clearer factual record and focused briefing on this point, the Court will then be able to determine whether, and if so to what extent, these allegations bring claims that have not, and could not have, been brought as claims of contract breach. There is no prejudice to Uteco from this outcome, as fulsome discovery into the parties' post-delivery dealings would occur even in the absence of this claim. *See, e.g.*, *Carovillano v. Sirius XM Radio Inc.*, 715 F. Supp. 3d 562, 586 (S.D.N.Y. 2024) (Engelmayer, J.) (denying motion to dismiss implied-covenant claim, without prejudice to defendants ability to move against the claim later in litigation); *In re Teekay Offshore Partners L.P. Common Unitholders Litig.*, No. 19 Civ. 6483, 2021 WL 1227415, at *11 (S.D.N.Y. Mar. 31, 2021) (same); *Chery v. Conduent Educ. Servs., LLC*, No. 08 Civ. 75, 2019 WL 1427140, at *8 (N.D.N.Y. Mar. 29, 2019) (same in light of "early stage" of litigation).[2]

---

[2] TC separately defends the implied covenant claim on the grounds that it pursues relief beyond that sought by the breach of contract claim—specifically, consequential and punitive damages. The Court has not relied on this argument in sustaining this claim. It is not clear from the AC that consequential damages would be available from the distinct breaches pled in the implied covenant claim, as opposed to from the underlying deficiencies in the Machine, which are the subject of the contract-breach claim. And, although the Court does not have occasion here to resolve the availability of punitive damages, it is doubtful that the facts pled would clear the high bar for such damages under New York law. *See A & M Warshaw Plumbing & Heating, Inc. v. Mount Vernon Fire Ins. Co.*, No. 24 Civ. 430, 2025 WL 69972, at *3 (S.D.N.Y. Jan. 10, 2025);

### C. Fraudulent Concealment and Mistake

The AC brings two claims sounding in fraud—fraudulent concealment and mistake. Each is subject to the heightened pleading standard of Rule 9(b).

#### 1. Fraudulent Concealment (Count Three)

To state a claim for fraudulent concealment under New York law, a complaint must allege the standard elements of fraud: (1) a material misrepresentation or omission of fact; (2) made by the defendant with knowledge of its falsity; (3) the defendant's intent to defraud; (4) reasonable reliance on the plaintiff's part; and (5) resulting damage to the plaintiff. *Tuosto v. Philip Morris USA Inc.*, 672 F. Supp. 2d 350, 362 (S.D.N.Y. 2009); *see also Yak v. BiggerPockets, L.L.C.*, No. 19 Civ. 5394, 2020 WL 5505351, at *10 (S.D.N.Y. Sept. 10, 2020). Where a claim sounds in nondisclosure, the plaintiff must establish that the "defendant had a duty to disclose material information." *Zottola v. Eisai Inc.*, 564 F. Supp. 3d 302, 316 (S.D.N.Y. 2021). A duty to disclose arises in one of three circumstances: where the parties are in a fiduciary relationship; under the "special facts doctrine," where "one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge"; or where a party has made a partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure. *See Aniero Concrete Co., Inc. v. New York City Constr. Auth.,* Nos. 94 Civ. 9111, 95 Civ. 3516, 1997 WL 3268, at *13 (S.D.N.Y. Jan. 3, 1997) (citing *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 123 (2d Cir. 1984)).

---

*Rockefeller Univ. v. Aetna Cas. & Sur. Co.*, 231 A.D.3d 457, 563 (2024) (implied covenant claim not duplicative of contract-breach claim where the consequential damages arising from the two could differ); *cf. Altruis Grp., LLC v. ProSight Specialty Mgmt. Co., Inc.*, No. 21 Civ. 10757, 2023 WL 2242048, at *2 n.2 (S.D.N.Y. Feb. 27, 2023) (dismissing breach of implied contract claim where complaint did not support claim of consequential damages or seek punitive damages).

The AC alleges two categories of ostensible fraudulent concealment. First, it alleges that Uteco owed TC a duty to disclose, before entering the Agreement, material facts it assertedly knew, including the problems it had experienced with customers Kinyosha and Nuova Erreplast and the inherent incompatibility of OPV with Kodak water-based ink. AC ¶¶ 98, 105. Second, it alleges that Uteco—after execution of the Agreement—concealed and omitted certain facts arising from the Machine's ability to ever perform as represented, including not disclosing the Machine's inability to achieve the maximum printing speed and width. *Id.* ¶ 99.

The AC does not plead facts sufficient to satisfy Rule 9(b) why the statements in either category were fraudulent. *See United States ex rel. Ladas*, 824 F.3d at 25.

As to Uteco's pre-Agreement representations, the AC does not plead that Uteco possessed "superior knowledge" that would have corrected a misimpression on which TC was acting. Contrary to the suggestion that Uteco's experiences with other customer had alerted it to relevant deficiencies with the Machine;s prototype, the AC alleges that as of October 2019, well into the parties' negotiations, Uteco had not installed a Sapphire EVO digital printer for a customer "anywhere in the world." AC ¶¶ 27–28. And although the AC alleges that in late 2019 and 2020, Uteco commenced installing a "packaging machine" at, respectively, Kinyosha and Nuova Erreplast, it does not plead when any issues with either printer became known to Uteco. *See id.* ¶¶ 31–36. Nor does the AC allege that TC's intended application requirements were the same as for the Kinoysha and Nuova Erreplast machines, so that Uteco was on notice that the Machine had been shown unable to meet TC's "intended application requirements." *Id.* ¶ 36. And the AC alleges that Kinoysha and Nuova Erreplast purchased "Uteco Sapphire EVO Model M" machines, whereas Uteco purchased a Sapphire EVO 242 Model 60 machine. *Id.* ¶¶ 105, 23. In these circumstances, far from satisfying Rule 9(b), the AC pleads only speculatively that

Uteco had prior knowledge of relevant deficiencies in the Machine. *See id.* ¶ 37 (identifying the device in Nuova Erreplast as a "similar make and model"). And as to the compatibility of the OPV with Kodak ink, the Agreement provided the usage was to be limited until Uteco had "verified" that OPV was compatible. Agreement at 6. The AC does not plead that, pre-Agreement, Uteco knew, or even could have known, of a fundamental incompatibility between the identified OPV and Kodak ink. Indeed, from the Agreement, it does not appear that a specific OPV had been recommended by Uteco at the time of its execution. *Id.* Nor does the AC factually support that Uteco knew, at the time it advertised that water-based inks would satisfy European and Swiss regulations, that the Machine was incompatible with such ink. Thus, although the AC pleads that Uteco affirmatively *made* such representations, AC ¶ 26, it does not plead facts supporting Uteco knew—or had superior knowledge to TC—of the performance problems that would later arise as to such ink.

As to the post-Agreement period, the AC alleges that Uteco concealed facts regarding the Machine's "run speed" and "usable printing width," *id.* ¶¶ 99(c)–(d), but it does not plead facts supporting that Uteco possessed but nonetheless withheld such facts. It does not, for example, allege, let alone with a factual basis, that Uteco durably believed the speed and width problems identified during the FAT were incapable of being solved. The AC suggests the contrary: that Uteco believed it could remedy these. It alleges, for example, that "Uteco performed various service visits, attempted adjustments, and made software updates," in response to TC's concerns. *Id.* ¶ 178.

TC's counterarguments are unavailing.

First, relying on *First Bank of Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 291–92 (1st Dept. 1999), TC argues that the performance problems Uteco encountered with the

Kinyosha and Nuova Erreplast installations support a claim of concealment. Opp'n. at 15. But *First Bank of Americas* is far afield. That complaint alleged that the defendants, to induce customers to purchase loans, prepared documents that "intentionally misrepresent[ed]" key details about the loans. *See First Bank of Americas*, 257 A.D.2d at 292. The AC here does not have any allegations of intentional falsehoods by Uteco, including about the other installations. *See Exceed Talent Cap., LLC v. Durk Derrick Banks*, No. 23 Civ. 10647, 2025 WL 444902, at *1 (S.D.N.Y. Feb. 10, 2025) (dismissing claim that extracontractual misrepresentation of a present fact induced plaintiff to enter contract for failure to plead fact with particularity); *Spencer v. Lab'y Corp. of Am. Holdins*, No. 19 Civ. 4927, 2024 WL 3675855, at *16–17 (E.D.N.Y. Aug. 6, 2024)(dismissing as conclusory, and not sufficiently particular, allegations that defendant committed fraud in marketing testing services), *aff'd sub nom. Spencer v. Lab'y Corp. of Am. Holdings*, 2025 WL 2779015 (2d Cir. Sept. 30, 2025) (summary order).

Second, TC argues that it is acceptable to plead fraud on "information and belief," because only Uteco could possess information on this point. Opp'n. at 16–17. The case law in the District requires more. To satisfy Rule 9(b), a complaint based on "information and belief" must "include[] a statement of facts upon which the belief is founded." *Asset Co IM Rest, LLC v. Katzoff*, No. 23 Civ. 9691, 2025 WL 919489, at *11 (S.D.N.Y. Mar. 26, 2025). The AC does not do so as to the material information regarding the Machine's inability to perform as represented, beyond speculating that Uteco, on unspecified dates, obtained this from the installations for other customers. *See, e.g.*, *United States v. New York Soc. for the Relief of the Ruptured & Crippled, Maintaining the Hosp. for Special Surgery*, No. 07 Civ. 292, 2014 WL 3905742, at *22 (S.D.N.Y. Aug. 7, 2014) (allegation akin to "upon information and belief" "does not satisfy Rule 9(b) unless accompanied by a statement of the facts upon which the belief is based" (citation

omitted)); *Conopco, Inc. v. Wein*, No. 05 Civ. 9899, 2007 WL 9818902, at *5 (S.D.N.Y. Aug. 31, 2007) (same).

Accordingly, the Court dismisses TC's fraudulent concealment claim.

**2. Mutual Mistake (Count Six)**

The AC alleges that the parties were mutually mistaken as to the Machine's fitness for its intended purposes, meriting recission. In moving to dismiss, Uteco principally argues that this claim fails to satisfy Rule 9(b). Mem. at 19–20.

A mutual mistake under New York law requires that both parties "shared the same erroneous belief as to a material fact, and their acts did not in fact accomplish their mutual intent." *ACA Galleries, Inc. v. Kinney*, 928 F. Supp. 2d 699, 701 (S.D.N.Y. 2013) (cleaned up), *aff'd*, 552 F. App'x 24 (2d Cir. 2014) (summary order). This mistake must be so "material" that it runs to the foundation of the agreement. *Simkin v. Blank*, 19 N.Y.3d 46, 52 (2012) (internal quotation marks omitted). Proof demonstrating a mutual mistake "must be of the highest order," showing "clearly and beyond doubt that there has been a [mutual] mistake." *MV Realty PBC, LLC v. Innovatus Cap. Partners, LLC*, 794 F. App'x 103, 107 (2d Cir. 2019) (summary order).

The AC here alleges the parties, at the time the Agreement was executed, were mutually mistaken as to a "material and fundamental" fact: their shared premise that the Machine would prove fit for its intended purpose. AC ¶ 141. But the AC does not adequately plead mutual mistake as to that fact, let alone a mistake that was "mutual, substantial, material and exist[ed] at the time the contract is entered." *ACA Galleries, Inc*, 928 F. Supp. 2d at 701. That is because, far from there being a mistake on this point, the Agreement recognized the novelty of the parties' undertaking, and the possibility that the Machine—which, as adapted for TC' use, was complex and bespoke—might not fulfill its intended purpose. Indeed, the Agreement provided a limited

mechanism for rescission, under which TC had a contractual right to cancel the Agreement and its obligation to purchase the Machine "if the [Machine] does not fulfill the agreed acceptance protocol." Agreement at 51.[3]

Under these circumstances, a claim of mutual mistake does not lie. As alleged, particular deficiencies with the Machine became apparent years after the agreement—including in 2021 and 2022, as exposed by the SAT. *See, e.g.*, AC ¶ 142 (citing issues with rub test, OPV smearing, and TC's quiet zone requirements). But the parties' inability to foresee these specific operational impediments does not support that, at the time of the Agreement, they misapprehended the core fact here: the possibility that the Machine might not prove capable of operating as intended. *See HSH Nordbank AG v. RBS Holdings USA Inc.*, No. 13 Civ. 3303, 2015 WL 1307189, at *16 (S.D.N.Y. Mar. 23, 2015) (plaintiffs did not plead mutual mistake as to a then-existing fact when mistake concerned future deliverables under the parties' agreement); *de la Gueronniere v. Simon*, No. 97 Civ. 4813, 1998 WL 226199, at *3 (S.D.N.Y. May 4, 1998) ("[T]he parties' mistaken assumptions [as to future events] do not, as a matter of law, rise to the level of a mutual mistake.") *Gap Inc. v. Ponte Gadea New York LLC*, 524 F. Supp. 3d 224, 240 (S.D.N.Y. 2021) (same). As pled, and as the Agreement bespeaks, the parties mutually appreciated that possibility and contracted in light of it.

Accordingly, the Court dismisses the AC's mutual mistake claim.

**3. Unilateral Mistake (Count Seven)**

The AC does not plead a viable claim of unilateral mistake. To do so, a complaint must allege that the mistake was "coupled with some fraud." *Metwally v. City of New York*, No. 19

---

[3] The AC's mutual mistake claim is not based on that provision. Whether TC has a meritorious claim for relief under that provision potentially may be litigated in connection with the surviving contract-breach claim.

Civ. 8206, 2022 WL 19766718, at *4 (S.D.N.Y. Dec. 16, 2022) (quoting *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)); *see also Travelers Indem. Co. of Illinois v. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 498 (S.D.N.Y. 2004).

Here, the AC alleges that TC was unilaterally mistaken at the time of the Agreement that "the Machine could meet its needs in printing packaging for the food industry." AC ¶ 154. The parties' shared recognition, evident in the Agreement, that the Machine might prove incapable of performing, however, defeats this claim. In any event, the AC does not plead fraud by Uteco as to this point. It alleges that Uteco knew from its internal testing, repeated FAT failures, and prior installations at Kinyosha and Nuova Erreplast that the Machine would definitely not meet these specifications. *Id.* ¶ 157. But for the reasons reviewed above, the AC has not pled fraud with particularity, including facts supporting that, at the time of the Agreement, it knew from its work with other customers that the Machine would be unable to perform. *Compare Andre v. Mattress Firm*, No. 18 Civ. 8244, 2019 WL 3066321, at *5 (S.D.N.Y. July 12, 2019) (dismissing claim of unilateral mistake where AC did not adequately plead that defendant "knew or should have known" that a mistake was being made at the time plaintiff entered into a contract), *with 105 Mt. Kisco Assocs. LLC v. Carozza*, No. 15 Civ. 5346, 2019 WL 6998008, at *12 (S.D.N.Y. Dec. 20, 2019) (adequately pled claim of unilateral mistake where defendant "went to great lengths" to avoid divulging information about radioactivity waste at property including "prevent[ing] investigators" from entering property in advance of sale); *see also De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 429 (S.D.N.Y. 2015) (sustaining allegations of fraud where gallery entered into corrupt agreement to sell forged paintings and permitting unilateral mistake claims to proceed).

Accordingly, the Court dismisses the AC's unilateral mistake claim.

**D. Unjust Enrichment (Count Four)**

The AC next alleges that Uteco was unjustly enriched because received and retained the benefit of TC's substantial payments for the Machine. Uteco argues this unjust enrichment claim duplicates the AC's breach of contract claim, which provides a mechanism for TC to recover, and therefore should be dismissed. Uteco is correct.

To state a claim for unjust enrichment under New York law, a complaint must allege: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)). "[T]he theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties." *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (2012) (internal quotation marks omitted).

Where, however, an unjust enrichment merely duplicates a contract claim, it cannot survive. *See Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (2012). Here, TC's unjust enrichment claim arises from the allegations it asserts in connection with its claim of breach. *Compare* ¶¶ 79–88, *with* ¶ 118. It alleges that, in multiple respects, Uteco breached the parties' agreement, entitling TC to the remedy of restitution. *Id.* But those breaches are the same ones on which its contract-breach claim relies, and that claim seeks the very same remedy, restitution of the funds TC paid in advance, plus other money damages. *See id.* ¶¶ 88, 129. And, far from disputing that the parties' relationship was governed by contract, the unjust enrichment claim alleges "the Agreement governs certain aspects of the parties' relationship." *Id.* ¶ 122.

In these circumstances, where the pleading admits a contractual relationship, claims breaches of that contract, and seeks remedies also sought by the contract-breach claim, an unjust enrichment claim is duplicative and cannot proceed. *See, e.g.*, *In re Columbia Tuition Refund*

*Action*, 523 F. Supp. 3d 414, 430 (S.D.N.Y. 2021) ("[C]ourts in this District have previously dismissed unjust enrichment claims that were indistinguishable from contract claims pleaded in the alternative . . . at least where the parties did not dispute that they shared a contractual relationship."); *Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P.*, No. 08 Civ. 10578, 2010 WL 1257326, at *9 n.6 (S.D.N.Y. 2010) ("[W]here Defendants dispute the existence of a valid, enforceable contract, Plaintiffs are permitted to proceed on both contractual and quasi-contractual theories.").

TC raises two counterarguments. Neither is persuasive.

First, it contends that its unjust enrichment claim "reaches conduct not limited to Uteco's contractual obligations." Opp'n. at 17. But an unjust enrichment claim may proceed in parallel, however, only where the "*subject-matter* of an unjust enrichment claim is not covered by a valid, enforceable contractual obligation." *Shak v. Adelphi Univ.*, 549 F. Supp. 3d 267, 274 (E.D.N.Y. 2021) (emphasis added). Here, the conduct embraced by the enrichment claim—the deficient Machine plus the "associated costs for installation, training, and recommended consumables"—arises from a dispute over the "Agreement." AC ¶¶ 120–22. The "subject matter" of the claim thus squarely arises from the Agreement. And the claim for breach of that Agreement seeks monetary relief for these associated costs. *See id.* ¶ 88. *See, e.g., DRL Software Sols., LLC v. JourneyPure, LLC*, No. 17 Civ. 9125, 2018 WL 1276856, at *2 (S.D.N.Y. Mar. 8, 2018) ("unjust enrichment claim in this case must be dismissed because the contract entirely governs the subject matter"); *Readick v. Avis Budget Grp., Inc.*, No. 12 Civ. 3988, 2013 WL 3388225, at *6 (S.D.N.Y. July 3, 2013) ("unjust enrichment is a quasi-contractual remedy which is generally not available where a valid and enforceable contract governing the same subject matter exists").

Second, TC argues that the unjust enrichment claim should survive to cover the event that the Court finds contract terms "unenforceable." *Id.* But even where plaintiffs have delineated and pursued unjust enrichment as "an alternative theory of recovery," as TC does here, courts have generally held that "claims for unjust enrichment will not survive a motion to dismiss where plaintiffs fail to explain how their unjust enrichment claim is not merely duplicative of their other causes of action." *Bermudez v. Colgate-Palmolive Co.*, 667 F. Supp. 3d 24, 45 (S.D.N.Y. 2023). Such is the case here. The AC does not "sufficiently distinguish" the unjust enrichment claim. *See, e.g.*, *Campbell v. Whole Foods Mkt. Grp., Inc.*, 516 F. Supp. 3d 370, 394 n.15 (S.D.N.Y. 2021) (rejecting argument that unjust enrichment claim could survive because it was brought in the alternative and dismissing claim as duplicative); *Nelson v. MillerCoors, LLC*, 246 F. Supp. 3d 666, 679 (E.D.N.Y. 2017) (dismissing unjust enrichment claim because it "relies on the same facts as [the] other causes of action in tort" (cleaned up)).

**E. Breach of Express Warranty (Count Five)**

The AC alleges, in the alternative, that Uteco breached an express warranty in the Agreement, which provided that the Machine, as provided, would be fit for its intended purchase and meet TC's specifications. AC ¶¶ 130–39. Uteco moves to dismiss, contending that TC does not identify what "defects" Uteco failed to repair and that any claim arising from issues with Kodak ink or OPV are beyond the scope of its warranty. Mem. at 17–18.

To survive a motion to dismiss for failure to state a claim for breach of an express warranty, a buyer must plausibly allege, "(1) plaintiff and defendant entered into a contract; (2) containing an express warranty by the defendant with respect to a material fact; (3) which warranty was part of the basis of the bargain; and (4) the express warranty was breached by defendant." *Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, No. 11 Civ. 4062, 2013 WL 372149, at *7 (S.D.N.Y. Jan. 31, 2013); *see also Peck Garrido v. Xgimi Tech. Inc.*, No. 24 Civ. 4290,

2025 WL 3165671, at *6 (E.D.N.Y. Nov. 12, 2025) ("In New York, a plaintiff must also give notice of the breach to the seller before he can recover under an express warranty claim").

The AC has amply pled facts supporting a plausible claim of breach of express warranty. The parties' Agreement contained an express warranty:

> Uteco warrants that the machine furnished to [TC] will be free from defects in workmanship and material, will be fit for its intended purpose and will conform to this Agreement, including the [TC's] specifications and the machine's specifications and documentation.

Agreement at 48.

As pled, this express warranty constituted a material statement upon which TC relied, and as to the asserted breaches of which TC gave timely notice. *See Mogull v. Pete and Gerry's Organics, LLC*, 588 F. Supp. 3d 448, 456 (S.D.N.Y. 2022). The AC alleges, in fact, that, on multiple occasions, TC conveyed to Uteco its claims that the Machine was not in compliance with Agreement's specifications: on or around March 11, 2021 (at the FAT), March 25, 2021 (after the second FAT), April 5, 2021 (in a letter memorializing the specification issues to be fixed), on August 18, 2021 (at the SAT), on September 8, 2021 (at a second SAT), and in November 2023. AC ¶¶ 52, 54–55, 58–59, 62–64, 66. These claims centrally alleged deficiencies in the printing width required by "the Buyer's specifications and the [M]achine's specifications and documentation." Agreement at 48. The AC alleges that, despite attempts by Uteco to solve these problems, the Machine could not do so, falling short by approximately one inch of the "full represented printing width." AC ¶¶ 41–42.

Uteco argues that the defects were not its fault, but arose from TC's use of OPV or from conduct by Kodak. The AC, however, pleads a number of defects of which TC gave Uteco notice that are unconnected to the use of OPV or to Kodak. These include: print defects (the Machin failed to "lay down white ink cleanly and produc[e] stitching lines" and experienced

"digital print stitching defects"), system errors, and unacceptable testing results relating to the Machine's inability to "return to register within 600 feet after a stop without operator involvement." AC ¶¶ 53, 59. Deviations of this sort from a product specifications are classically sound bases for breach of express warranty claims. *See, e.g.*, *Cohen v. Nutricost*, 747 F. Supp. 3d 467, 471–75 (E.D.N.Y. 2024) (sustaining breach of express warranty claim when vitamin promising 420 mg of magnesium did not contain the specified amount); *Peck Garrido*, 2025 WL 3165671, at *6 (same, where projector advertised with a brightness rating of 1,760 ISO lumens but, as pled, could achieve only 1,500 ISO lumens).

Accordingly, TC's breach of express warranty claim has been adequately pled.

### F. Failure to Cure (Count Nine)

The AC alleges that Uteco failed to deliver conforming goods and failed to cure the identified nonconformities within a reasonable time, if ever. AC ¶ 178. In moving to dismiss, Uteco argues that the AC does not allege that the Machine did not conform to any required specification or that TC timely notified Uteco of any alleged defects. Mem. at 21–22.

In fact, as reviewed above, the AC pleads multiple ways in which the Machine's performance deviated from the Agreement's specifications. *See, e.g.*, ¶¶ 52, 54–55, 58–59, 62–64, 66. Uteco itself acknowledges the AC's allegation that the Machine did not conform to its specifications with respect to "maximum printing width." Mem. at 22. And, contrary to Uteco's argument that the AC does not plead damages arising from that nonconformity, it does so plead. The reduction in printing width, it alleges, "rendered the Machine non-functional for certain products that TC needed to and was misleading as to the true, usable printing width of the asset, thereby impairing its value and utility for TC's business operations." AC ¶ 41. On this basis and others, the AC has adequately pled a claim of failure to cure. *See Franklin Cap. Holdings LLC v.*

*NY Accessory Grp., LLC*, No. 13 Civ. 1153, 2014 WL 2117265, at *3–5 (S.D.N.Y. May 21, 2014).

The AC also pleads that TC gave Uteco timely notice of the Machine's nonconformities. It alleges that, in 2021 and 2022, the parties regular communicated about the issues TC raised about the Machine, AC ¶¶ 176–77, 180, and that the issues TC identified after the FAT persisted, *id.* ¶ 183.[4] The AC is thus readily distinguished from complaints that asserted a failure to cure where the defects were first alleged after a reasonable notice period had concluded. *Premier Mountings, Inc. v. Clyde Duneier, Inc.*, No. 02 Civ. 4897, 2003 WL 21800082, at *4 (S.D.N.Y. Aug. 6, 2003) (8.5-month delay between identification of nonconformities and notification to defendant too long to support claim of failure to cure); *Spinal Techs., LLC v. Mazor Robotics Inc.*, 624 F. Supp. 3d 330, 343 (S.D.N.Y. 2022) (2.5-year period between identified defects and "different problems" in device too long to support failure to cure claim).

Accordingly, the AC has plausibly stated a claim for failure to cure.

### G. Claims as to Uteco NA

Finally, Uteco NA moves to dismiss all claims as against it, on the ground that it is not a party to the Agreement between Uteco Converting and TC. Mem. at 23–24. The Court denies that motion, because based on the Agreement, which is cognizable on this motion, and the AC, it is plausible that Uteco NA is such a party.

As to the Agreement, its definitional provisions do not supply a definition of "Uteco." Nor does the Agreement ever define Uteco to refer exclusively to Uteco Converting. To the extent the Agreement separately identifies either Uteco NA or Uteco Converting, it does so only

[4] Defendants' own evidentiary submissions—which the Court assumes *arguendo* are cognizable on this motion—themselves detail TC's reported issues with the Machine around the time of the FAT and SAT. These include emails, *see* Dkt. 27 ("Fiorucci Decl."), Ex. 1, the parties' joint formulation of test protocols, *id.*, Ex. 2, and a letter, *id.*, Ex. 3.

as to Uteco Converting and only on two occasions—once in reference to third party equipment and once in reference to spare parts. *Id.* at 48–49. The text of the Agreement leaves plausible the inference that "Uteco" encompassed Uteco Converting and Uteco NA.[5] Reinforcing this inference, the Agreement bears the signature of a Uteco NA representative: Mario Mucciacciaro, whom the Agreement identifies as "Executive VP – Uteco North America." Agreement at 54. The presence of Mucciacciaro's signature and title is notable because three other Uteco signatories to the Agreement—Enrico Rimini, Simone Quinto, and Aldo Peretti—are all identified by their titles—chief, digital printing unit; CFO; and president, respectively—without any identified affiliation among the Uteco entities. *Id.* His identified corporate affiliation supports the inference that among the parties to the Agreement was "Uteco NA." *See, e.g.*, *CityR Grp. Holdings LLC v. Foresite Realty Mgmt., LLC*, No. 17 Civ. 7850, 2019 WL 1437519, at *3–4 (S.D.N.Y. Mar. 29, 2019) (signature line in agreements identifying parent company as the "Manager" of the subsidiary signatory plausibly supported that parent and subsidiary were both bound by contract); *TransformaCon, Inc. v. Vista Equity Partners*, Inc., No. 15 Civ. 3371, 2015 WL 4461769, at *3 (S.D.N.Y. July 21, 2015) (same).

The AC's allegations, which must be treated as factually accurate on this motion, support the inference that Uteco NA intended to be bound by the Agreement. It reflects engagement by

[5] In its opposition brief, TC identifies emails it exchanged with Uteco NA personnel during the Machine's installation and testing, citing, as support, exhibits defendants supplied in support of their motion to dismiss. Opp'n. at 24 (citing Dkts. 27-1, 27-2, 27-3). In sustaining the claims against Uteco NA, the Court has not relied on these representations, to the extent they exceed the scope of the AC, as such materials do not appear to be cognizable on a motion to dismiss. *See Rowe Plastic Surgery of New Jersey, L.L.C. v. Aetna Life Ins. Co.*, 705 F. Supp. 3d 194, 200 (S.D.N.Y. 2023) (finding evidentiary materials defendant introduced in briefing motion to dismiss, which had not been attached or incorporated in complaint, not properly before the court), *aff'd*, 2024 WL 4315128 (2d Cir. Sept. 27, 2024) (summary order). In discovery, the parties are, of course, at liberty to explore the issues.

Uteco NA personnel in central acts implementing the Agreement. These include that TC coordinated with Mucciacciaro, Uteco NA's executive VP, to identify the appropriate Uteco machine to purchase; that Mucciacciaro, and at least two other Uteco NA employees, Tom Hatzilambros (a Uteco NA sales associate) and Marco Verini (a Uteco NA service director) negotiated with TC regarding the process and installation of the Machine; and that in 2021 and 2022 TC reported issues with the Machine to Uteco NA officer Mucciacciaro and employee Verini. AC ¶¶ 63, 102, 133, 167. As such, the AC plausibly alleges a basis for permitting the claims against Uteco NA to proceed. *See, e.g.*, *Jennings v. Hunt Cos., Inc.*, 367 F. Supp. 3d 66, 71–72 (S.D.N.Y. 2019) (involvement of non-signatory company's officers in negotiations supported that non-signatory company manifested intent to be bound by contract); *Powerbox (USA) v. Honeywell Int'l.*, No. 20 Civ. 3638, 2020 WL 6151491 (S.D.N.Y. Oct. 20, 2020) (same, where Honeywell representatives were involved with coordinating plaintiff's initial and revised orders).

**CONCLUSION**

For the above reasons, the Court partially grants and partially denies Uteco's motion. The Court denies Uteco's motion to dismiss Counts One, Two, Five, Eight, and Nine of the AC. The Court grants Uteco's motion to dismiss Counts Three, Four, Six, and Seven.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: August 13, 2026
New York, New York